## UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF COLORADO
### Bankruptcy Judge Elizabeth E. Brown

| | |
|---|---|
| In re:<br><br>LARRY IVAN BEHRENDS,<br><br>Debtor. | Bankruptcy Case No. 13-22392 EEB<br>Chapter 7 |
| JOLI A. LOFSTEDT, chapter 7 trustee,<br><br>Plaintiff,<br><br>v.<br><br>VICKIE L. OLETSKI-BEHRENDS, and<br>21st CENTURY FINANCIAL SERVICES,<br>LLC,<br><br>Defendants. | Adversary Proceeding No. 14-1377 EEB |

## ORDER ON COMPLAINT

THIS MATTER comes before the Court following a trial on the complaint, filed by Joli A. Lofstedt, chapter 7 trustee ("Trustee") of the bankruptcy estate of Debtor Larry Behrends ("Debtor"), against Defendant Vickie Oletski-Behrends ("Defendant") and Defendant 21st Century Financial Services, LLC (the "LLC"). The LLC failed to file an answer and the Court entered a default against it, finding that it was the alter ego of the Debtor. Remaining at issue is whether the Trustee may recover transfers from the Debtor to the Defendant, his wife, as fraudulent transfers, and recover assets purchased by the Debtor in Defendant's name under an implied trust theory. For the reasons set forth below, the Court concludes that the Trustee may avoid and recover most, but not all, of the transfers and assets.

## I.    JURISDICTION

On July 28, 2015, almost one year after filing her Answer, the Defendant filed a motion to withdraw this case to the federal district court. On October 30, 2015, the district court denied her request on two grounds. First, it held that her request was untimely. The Defendant had argued that a motion is timely if filed any time before the court set a trial date. The district court rejected this notion. It held it would be "timely" under 28 U.S.C. § 157(d) only if "it was filed 'as promptly as possible in light of the developments in the bankruptcy proceeding,' or, more simply, if it was filed 'at the first reasonable opportunity.'" *Lofstedt v. Oletski-Behrends (In re Behrends)*, No. 15-cv-01854-CMA, slip op. at 5 (D. Colo. Oct. 30, 2015) (citing *United States v.*

*Kaplan*, 146 B.R. 500, 503 (D. Mass. 1992)).  With the passage of almost one year, the Defendant's request did not meet this requirement.

Moreover, the district court held that the Defendant had expressly consented to the bankruptcy court's jurisdiction.  In her Answer, the Defendant admitted that this Court had jurisdiction over the Trustee's claims of fraudulent transfer, constructive trust, and resulting trust.  In a Joint Rule 7026 Report, both parties "agreed that the Bankruptcy Court may enter final judgment with respect to the claims asserted in this matter."  Joint Rule 7026 Report to the Court at ¶ 2, ECF No. 10.  Again, on July 24, 2015, the parties filed stipulated facts in which they agreed that this Court had jurisdiction over the parties and the claims.  Four days after submission of the stipulated facts, however, the Defendant filed her motion to withdraw the reference, seeking to withdraw her prior consent.

The Defendant argued to the district court that the Trustee's complaint alleged multiple state-law claims over which a bankruptcy court does not have constitutional authority to enter a final order and judgment, relying on *Stern v. Marshall*, 564 U.S. 462 (2011).  For example, the Trustee has pled fraudulent transfer claims under state law.  The bankruptcy court has statutory authority to hear this type of claim under 28 U.S.C. § 157(b)(2)(H), but likely does not have constitutional authority to render a final decision.  *See Grandfinanciera, S.A. v. Norberg*, 492 U.S. 33, 60-62 (1989).  However, months before the Defendant filed her motion to withdraw the reference, the Supreme Court had already ruled that parties may consent to have the bankruptcy court hear so-called "*Stern* claims."  *Wellness Int'l Network, Ltd. v. Sharif*, 135 S. Ct. 1932, 1948 (2015).  In other words, consent of the parties will cure any constitutional infirmities.

The Defendant appealed the district court's ruling to the Tenth Circuit.  The Tenth Circuit, in turn, dismissed the appeal, holding that it was interlocutory in nature and the Defendant had not sought leave to appeal.  As a result, the district court's order remains the law of the case, and binding on this Court.  Thus, this Court has jurisdiction to enter a final order and judgment on all of the Trustee's claims.

## II.    BACKGROUND

The schedules Debtor filed in this bankruptcy case indicate that he owns no real property, no vehicles, and no bank accounts.  The Defendant, on the other hand, holds sole title to two homes, three luxury vehicles, and several sizeable bank accounts.  The Trustee asserts that the Debtor contributed the funds to acquire and maintain these assets, but intentionally caused his wife to acquire sole title in order to keep them out of the reach of his existing and future creditors.

While he is now an entrepreneur, the Debtor was a licensed securities broker for thirty-six years until he retired from this line of work in 2010.  Although his income as a broker varied, he earned in excess of $1 million per year in his most successful years.  The Defendant, on the other hand, did not earn a salary after her marriage to the Debtor.  She started her own interior design business, but that business never generated significant income.  Defendant received social security benefits and child support of approximately $3,000 per month for the first few years of her marriage to Debtor, but that stopped by 1994 or 1995.  After this point, the Debtor was her only source of income.  Nevertheless, she argues she paid for all the assets titled in her name and

that the Debtor's money transfers to her merely represented his contributions to household expenses.

### A.    The Debtor's Personal and Financial History

#### 1.    1987-1996: Divorce and Bankruptcy

The Defendant and Debtor married in October 1990.  During the three years prior to their marriage, Debtor had been embroiled in a contentious divorce.  Debtor felt that he lost everything in the divorce.  Resentful and struggling financially, he became significantly delinquent on both his domestic support obligations and taxes.   He described his predicament as follows:

> [B]y 1987 we began divorce proceedings that didn't reach closure until August of 1990. I don't recall exactly which years, but I believe it was 1988 and 1989 that she refused to release joint funds to pay our federal and state income taxes.  My attorney assured me that the judge in the case would direct that most debts and certainly all taxes would be paid before any division of assets.  Unfortunately for me, not only was she awarded all of the liquid assets, I was left to figure out how to pay the taxes and other debts.  Prior to the filing in 1987 our net worth was in the range of $700,000.  After legal bills, reduced earnings and high maintenance payments I was left with more than $200,000 in taxes and debt with no offsetting assets.  To further exacerbate my problems I was required to pay alimony of approximately $2,500 per month while my earnings had plummeted. . . .  It was during this period that I also tried working with the IRS to catch up and work out some kind of payment program. . . .  I tried to explain [my situation due to the divorce].  [The IRS agent's] comment to me was "my poor planning wasn't his problem". . . .  Being extremely naïve when he asked me where I banked, I told him.  The next day what meager funds I had were gone. . . .

Ex. 90, at 002484.[1]

Faced with contempt proceedings and mounting tax debts, the Debtor filed his first chapter 7 bankruptcy in 1996.  In that case, he indicated that he owned no significant assets.  He scheduled $71,000 in past-due domestic support obligations and $81,000 in tax debt.

#### 2.    1998: Revenue from the Conifer Ridge Project

In the early 1990s, Debtor realized a sharp drop in his income as a broker.  This spurred him to look for other sources of revenue and he decided to enter the world of real estate development.  His first project, called Conifer Ridge, involved developing raw land in Greeley, Colorado into a gated community.  Having identified suitable land, the Debtor contacted the landowner, Mr. Dave Stevens, to propose a joint project.  In 1992, they formed Conifer Ridge,

---

[1] All of the Trustee's exhibits (Exs. 1-111), including this letter, were admitted by stipulation of the parties, without reservation.  Thus, Defendant waived any objections to admissibility, including hearsay.  *See United States v. Mezzanatto*, 513 U.S. 196, 202 (1995).

LLC.  The only members of this entity were the Defendant and Mr. Stevens.  Trial Tr. for May 5, 2016, ECF No. 89 ("Tr. I"), 63:23.  The Debtor received no membership interest.  This project became a significant source of income at the time of sale of the property in 1998.  The Defendant, however, received the sale proceeds instead of the Debtor.

In this action, the Trustee asserts that these funds belonged to the Debtor and that the Debtor allowed their distribution to the Defendant only to shield the funds from his creditors.  The Defendant testified that she was entitled to this money because it was actually her project and she, rather than the Debtor, was the driving force behind it.  The Defendant described her role in the project as "giving concepts" and "developing ideas" for the various design aspects of the development, such as the type of street signs, gates, landscaping and helping to put together design guidelines for future builders.

The evidence, however, did not support her assertions that she was a significant contributor.  Despite not being a member, the Debtor admitted he performed all the major tasks necessary for developing this land.  He arranged the financing for the project.  He worked with city representatives to get the necessary approvals and platting.  He dealt with the contractors and oversaw construction of the infrastructure, such as the streets and utilities.  In his divorce court contempt proceedings, Debtor testified that he "just about lived out there" while he was managing the project.  Ex. EE, at 20:9.  The Defendant admitted she played no part in these tasks and, in fact, was completely unaware that Conifer Ridge had secured loans to finance development.

In a letter to his financial advisor in 2008, the Debtor described his involvement in this project as follows:

> Thinking I needed to find some way to come up with larger lump sums, I entered the real estate development arena in Greeley. While I managed to get funding help from a bank and other private equity, I was met with resistance from existing developers and city hall throughout the entire process. What I started in 1993, I was finally able to get extricated from in 1998, a period during which I ultimately made no money but lost more. [. . . ] While I was able to finally sell the nearly completed gated community in 1998, the proceeds paid only the primary debt. I had borrowed additional funds the previous 2 years which needed to be paid back in order to protect my ability to keep my securities license ...... and my integrity.

Ex. 90, at 002484.  It is clear from this letter that Debtor considered Conifer Ridge to be *his* project and that he could use *his* proceeds as he saw fit.

In his sworn testimony in divorce-related contempt proceedings in 1997, he also testified as to his intended plans for these proceeds:

> I found a piece of property that was for sale and – and worked out some negotiations on that to where[,] as the property sold[,] I would get a percentage of the net sales to – to hopefully give me some larger sums of money to go ahead and pay off [my ex-wife].  I wanted to get on with my life and I felt that – that was a window that might allow me to do that.

4

Ex. EE, at 19:18-24.

Mr. Stow Witwer, who acted as counsel for Mr. Stevens (now deceased) on the project, testified that Debtor "was the development person" and that Conifer Ridge, LLC "was [the Debtor's] company." Trial Tr. For May 6, 2016, ECF No. 80 ("Tr. II"), 10:18-19. Mr. Witwer was unaware of any significant role that Defendant played in the project. Tr. II, 12:25-13:4.

Eventually disputes arose between Debtor and Mr. Stevens. In order to part ways, they agreed to sell the development to a third party in 1998. Mr. Jeffrey Bedingfield represented the purchaser in the sale transaction. Mr. Bedingfield testified that he negotiated the sale price with Debtor, not the Defendant. In addition to sales proceeds of $205,000, Debtor and Mr. Bedingfield agreed that Defendant would receive a fee on all future lot sales. Despite her receipt of these proceeds, Defendant did not list this income on any of her tax returns.

The Debtor testified that he did not acquire a membership interest because then he would have needed to obtain approval from securities regulators. However, as Mr. Witwer recalled, "[Debtor] did not want to be a named member because it would expose his interest to claims of creditors including his former wife." Tr. II, 11:16-18. In fact, in divorce contempt proceedings, Debtor told that court he was not an owner of the project because his ex-wife held a judgment against him. "I was never an owner anyway, but I couldn't be an owner until I paid off a twenty-five thousand and some dollar judgment that [the title company] pulled up out of the County records and I certainly didn't tell them about it." Ex. EE, at 16:18-25. Thus, the Conifer Ridge project was Debtor's project. The income his family received came from his personal services. He merely arranged for the payments to go to his wife in order to defeat the claims of his creditors.

### 3.    1999-2010: Securities Revenue and Additional Debts

After the Conifer Ridge project ended, Debtor returned to his career as a securities broker. While he associated with several different broker-dealers from 1999 through 2010, he was associated with CapWest Securities during his most profitable years from 2005-2008. At Cap West, he earned in excess of $1 million per year. However, during this same period, he again stopped paying taxes. He paid no taxes and filed no returns from 1999 through 2008, even though he earned an aggregate of approximately $4.6 million during those years. Despite his rising income, Debtor still held no assets in his name.

In 2005, the IRS began assessing taxes and penalties against the Debtor. In 2008 and 2009, Debtor filed returns for some of the past tax years and paid a portion, but not all, of his outstanding taxes. In Debtor's present bankruptcy case, the IRS has filed an unsecured proof of claim for $1,380,600, which includes taxes, penalties and interest owed for tax years 2005-2008.[2]

In addition, during the period from 2009 to 2011, several brokerage clients sued the Debtor in nine separate cases, alleging combined damages of more than $3,200,000. Of those complaints, three remained pending at the time of this bankruptcy filing. Claims from these

---

[2] At various times, the IRS levied tax liens against the Debtor. As of the petition date, however, the IRS held no outstanding liens.

three suits alleged aggregate damages of $848,000.00. In 2011, courts entered two judgments against Debtor in the combined amount of $742,264.04. The Financial Industry Regulatory Authority imposed $39,500 in fines and penalties against Debtor for arbitration fees. In 2012, shortly before his second bankruptcy filing on July 19, 2013, another customer filed suit against the Debtor in Delaware.

> **B.     Assets Sought by the Trustee**

In this proceeding, the Trustee is seeking to recover both homes, all three vehicles, and money transfers exceeding $357,000.

> **1.     21st Street Property**

The Trustee is seeking to recover title to a home located at 2010 21st Street in Greeley, Colorado (the "21st Street Property"). The Defendant purchased this home in 1989, a few months before she married Debtor, by means of a $25,000 down payment and the assumption of an existing mortgage. That mortgage, held by Bank Western Federal Savings Bank, had a balance of $117,600 at the time of purchase. The down payment came from a loan from the Debtor's father, Mr. Ivan Behrends, to Defendant. Shortly after this purchase, the Debtor assumed the loan obligation owed to his father and secured it by giving his father a mortgage on his prior marital residence. Ex. 80, at 6; Ex. 10. When his prior marital home sold in 1991, Debtor repaid his father. Thus, in actuality, it was the Debtor, and not the Defendant, who paid the down payment on the 21st Street Property.

The Court received conflicting testimony as to the source of funds for the full repayment of the Bank Western mortgage on this home, which occurred in April 2002. Ex. 11A. At first, Debtor and Defendant testified that they used the proceeds of a $75,000 home equity line of credit ("HELOC") obtained in August 2003. However, when opposing counsel pointed out that the mortgage repayment preceded the HELOC loan by over one year, the Debtor then testified that they used the HELOC money to refurbish the house. Defendant, on the other hand, testified that a different loan paid for renovations on the 21st Street Property. No one answered the question of what source of funds enabled them to retire the mortgage.

Nor did the Court receive bank statements or other documentary evidence that showed who made the Bank Western mortgage payments or who paid off the mortgage in 2002. Defendant testified that she made some of the mortgage payments from the social security and child support she received in the early 90s. After those payments stopped sometime in 1995, Defendant admits her only source funds was the Debtor. Debtor and Defendant moved out of the 21st Street Property in 2006, but the Defendant still owns the property.

While this action has been pending, in March of 2015, Defendant borrowed $110,000 from Mr. Arlo Richardson, a friend and former co-worker of the Debtor. Tr. I, 133:15-16; Ex. 109. In exchange, she gave Mr. Richardson a deed of trust on the 21st Street Property. Ex. 108. It is unclear how much of this debt remains outstanding or whether it was a bona fide transaction.

2.      **The Residence**

The Debtor and Defendant currently reside in a property located at 4635 W. 21st Street Circle, Greeley, Colorado (the "Residence").  The Defendant testified that she purchased the Residence in 2004 because they wanted a home without stairs.  The title documents show Defendant made a down payment of $132,192 and financed the balance of the purchase price with a mortgage loan of $386,250.  Defendant is the sole obligor on the mortgage, which had an original monthly payment of $2,466.  As Debtor testified, banks were freely loaning money in 2004 and the mortgagee did not seem to care that Defendant had no income of her own.

The Defendant made much of the fact that she had sufficient funds in her various bank accounts in 2004 to enable her to pay the down payment herself.  However, she also admitted that either the Debtor or the Conifer Ridge project provided her with these funds.  Thus, in reality, the source of both the down payment and the monthly mortgage payments came from the Debtor's funds and assets.

3.      **The Vehicles**

Defendant currently holds sole title to three vehicles: a 2004 Jaguar XJ, a 2005 Chevrolet Corvette, and a 2008 Cadillac Escalade.  The Defendant drives the Jaguar.  She testified that she traded in a Mercedes to make the down payment and then paid monthly lease payments on it until the lease ended in 2007.  At the end of the lease, she purchased the Jaguar for an unspecified amount.  In 2007, the Defendant had no source of income other than the Debtor, so she had to have used funds from the Debtor to buy the Jaguar.  The Defendant further testified that she bought the Corvette in 2007.  No one is currently driving the Corvette.  She paid for this vehicle out of her account but, once again, Debtor provided the funds in her accounts.  Although titled only in the Defendant's name, the Debtor drives the Escalade.  They purchased this vehicle in 2007 by trading in a 2005 Escalade and paying an additional $12,000.  Defendant admitted that Debtor paid the $12,000.  The 2005 Escalade, used as a trade-in, had been purchased in 2005, at a time when the Debtor was the only source of this family's funds.

In addition, Debtor claimed depreciation for the Escalade, the Jaguar, and the Corvette on his tax returns.  He also used the LLC's bank account to pay various expenses related to all three vehicles, such as insurance and license plate fees.

4.      **Money Transfers**

The Debtor also kept his funds out of the reach of his personal creditors.  The Defendant testified that, early in their marriage, they had a joint bank account, but she could not recall when, or for how long.  For most of their marriage, they maintained separate bank accounts. Defendant further testified that she normally paid their household bills.  Since she had no income of her own, the Debtor transferred money into her accounts for the payment of household expenses, but never at regular intervals or in a set amount.  Defendant testified that she never knew when she would get money from the Debtor and they "never discussed finances, never." Tr. I, 84:13.

The transfers of funds to the Defendant came from a business bank account Debtor maintained for the LLC, an entity he formed in 1998.  From this business account, he paid some

of his personal expenses and otherwise transferred the funds to the Defendant to enable her to pay all of the other bills. At times he transferred funds into a personal bank account of his own, but only in time to cover the checks he gave to the IRS. In this manner, he was able to shield his income from garnishing creditors.

Defendant admits that Debtor directly or indirectly transferred a total of $357,695.22 to her in the three-year period between 2007 and 2010 (the "Money Transfers"). Debtor made many of these Transfers from the LLC's bank account. Since the Court has already ruled that the LLC is the Debtor's alter ego, the Court considers these transfers to be transfers of the Debtor's funds. In other instances, Debtor caused securities firms for which he worked, or in which he owned an interest, to pay these funds directly to the Defendant. Although Defendant reported receipt of some of these funds as income on her tax returns, she admits the funds belonged to Debtor. However, both the Debtor and Defendant maintain that the Money Transfers represent the Debtor's contributions to household expenses.

The Money Transfers occurred on the following dates and in the following amounts:

|     | Date | Amount | Source |
| --- | --- | --- | --- |
| 1. | 04/13/07 | $3,045.92 | Capstone Financial Group |
| 2. | 04/18/07 | $50,000.00 | 21st Century |
| 3. | 05/01/07 | $2,754.13 | Capstone Financial Group |
| 4. | 07/16/07 | $50,000.00 | 21st Century |
| 5. | 12/28/07 | $70,000.00 | 21st Century |
| 6. | 12/30/07 | $73,500.00 | Colorado Capital Holdings |
| **2007 subtotal** | | **$249,300.05** | |
| 7. | 01/15/08 | $14,321.50 | Capstone Financial Group |
| 8. | 01/17/08 | $3,073.67 | CapWest Securities |
| 9. | 10/04/08 | $30,000.00 | 21st Century |
| 10. | 12/26/08 | $20,000.00 | 21st Century |
| **2008 subtotal** | | **$67,395.17** | |
| 11. | 04/27/09 | $10,000.00 | 21st Century |
| 12. | 10/03/09 | $5,000.00 | 21st Century |
| 13. | 11/04/09 | $5,000.00 | 21st Century |
| 14. | 12/28/09 | $5,000.00 | 21st Century |
| **2009 subtotal** | | **$25,000.00** | |
| 15. | 03/11/10 | $5,000.00 | 21st Century |
| 16. | 04/29/10 | $6,000.00 | 21st Century |
| 17. | 07/09/10 | $3,000.00 | 21st Century |
| 18. | 11/24/10 | $2,000.00 | 21st Century |
| **2010 subtotal** | | **16,000.00** | |
| **Grand Total** | | **$357,695.22** | |

## III.    FRAUDULENT TRANSFER CLAIMS

The Trustee seeks to recover the Money Transfers as fraudulent transfers under § 544(b). In this case, the Trustee asserts that the Money Transfers would be avoidable by a creditor under Colorado's Uniform Fraudulent Transfer Act ("CUFTA"), specifically Colo. Rev. Stat. §§ 38-8-105(1) and 38-8-106(1).  To avoid a transfer under Colo. Rev. Stat. § 38-8-105(1), the Trustee must prove: (1) a transfer made by the Debtor; (2) with actual intent to hinder, delay, or defraud any creditor of the Debtor; or (3) without receiving reasonably equivalent value in exchange for the transfer at a time when the Debtor was engaged in business for which he had unreasonably small assets or the Debtor intended to incur or believed that he would incur debts beyond his ability to pay (collectively, the "zone of insolvency").  A transfer is avoidable under Colo. Rev. Stat. § 38-8-106(1) if: (1) a transfer was made by the Debtor; (2) without receiving reasonably equivalent value in exchange; and (3) the Debtor was insolvent at the time of the transfer or became insolvent as a result of the transfer.  In this case, the Defendant does not dispute the first element of these claims—that Debtor transferred his money to the Defendant.  However, she argues the Trustee has not established the remaining elements.  The Defendant also contends a statute of limitations bars the Trustee's CUFTA claims.

### A.    Statute of Limitations

At first blush, it would seem reasonable to assume the CUFTA claims are untimely, given that the Money Transfers occurred so many years before this bankruptcy filing.  Thus, the Court begins its analysis with the statute of limitations defense.  When a trustee brings a claim under § 544(b), he or she is "standing in the shoes" of an existing creditor with an actual claim who could avoid the transfers in question.  *See Sender v. Simon*, 84 F.3d 1299, 1304 (10th Cir. 1996). Section 544(b) confers no greater rights on a trustee than a creditor would have against the defendant under state law.  Thus, if the applicable statute of limitations would bar a creditor from bringing an action on the petition date, then the trustee is also barred.  *See Rosania v. Haligas (In re Dry Wall Supply, Inc.)*, 111 B.R. 933, 936 (D. Colo. 1990).

Under CUFTA, a fraudulent transfer claim under §§ 38-8-105(1) or 38-8-106(1) must be brought within four years from the transfer date or, if the claim alleges actual fraudulent intent pursuant to § 38-8-105(1)(a), within the later of four years from the transfer date or one year after the transfer could reasonably have been discovered by the claimant.  Colo. Rev. Stat. § 38-8-110.  Applying a four-year reach back period, the Trustee in this case could recover transfers that occurred on or after July 19, 2009.  A good portion of the Money Transfers happened prior to this date.

The Trustee argues, however, that CUFTA's statute of limitations does not apply because, under § 544(b), she is standing in the shoes of the IRS.  With its proof of claim for $1,380,600, the IRS is an actual unsecured creditor in Debtor's case.  The IRS, the Trustee argues, is a sort of "super creditor" that, under federal law, is not bound by state statutes of limitation.  *United States v. Spence*, 2000 WL 1715216 at *3 (10th Cir. Nov. 15, 2000) ("[T]he United States is not bound by state statutes of limitation . . . in enforcing its rights.").  The Internal Revenue Code allows the IRS to collect outstanding tax liability from a transferee of property of the delinquent taxpayer.  *See* 26 U.S.C. § 6901(a)(1)(A); *Scott v. Commissioner*, 236 F.3d 1239, 1241 (10th Cir. 2001).  In doing so, the IRS must first establish liability under

9

applicable state law, such as a fraudulent transfer statute. *Scott*, 236 F.3d at 1241. Then the Internal Revenue Code replaces the state statute of limitation with its own time deadline unrelated to the date of transfer. The IRS's collection efforts are governed by 26 U.S.C. § 6502(a), which gives the government "ten years from the date of the [tax] deficiency assessment to institute a proceeding to collect on the assessment." *Spence*, 2000 WL 1715216 at *3.

Thus, as long as the IRS initiates its action within ten years of its assessment date, its claim is timely. In the Debtor's case, the IRS' claim is for the tax years 2005 through 2008. According to IRS records, it assessed taxes for the 2005, 2006, 2007, and 2008 tax years on February 9, 2009, April 27, 2009, April 13, 2009, and June 8, 2009, respectively. Exs. 84F, 84G. Based on these dates, and applying 26 U.S.C. § 6502, the ten-year period began to run, at the earliest, on February 9, 2009. The IRS, therefore, has until February 9, 2019 to initiate a collection action against a transferee (such as Defendant) to collect the 2005 tax debt; until April 27, 2019 to collect the 2006 debt, and so on. On Debtor's petition date, none of the ten-year periods applicable to an IRS collection action had expired. Since the IRS' limitation period had not expired, the Trustee's CUFTA claims are timely.

A majority of courts that have the addressed this issue agree that a trustee pursuing claims under § 544(b) may invoke the Internal Revenue Code's longer statute of limitations so long as the IRS is an actual unsecured creditor in the debtor's case. *See Ebner v. Kaiser (In re Kaiser)*, 525 B.R. 697, 711-12 (Bankr. N.D. Ill. 2014); *Alberts v. HCA. (In re Greater Se. Cmty. Hosp. Corp. I)*, 365 B.R. 293, 304 (Bankr. D.D.C. 2006); *Shearer v. Tepsic (In re Emergency Monitoring Technologies, Inc.)*, 347 B.R. 17, 19 (Bankr. W.D. Pa. 2006); *G-I Holdings, Inc. v. Those Parties Listed on Exhibit A (In re G-I Holdings, Inc.)*, 313 B.R. 612, 635 (Bankr. D.N.J. 2004); *Osherow v. Porras (In re Porras)*, 312 B.R. 81, 97 (Bankr. W.D. Tex. 2004).

At least one court has disagreed with these holdings, concluding that it was not Congress' intent in passing § 544(b) to vest a bankruptcy trustee with the sovereign powers of the IRS. *Wagner v. Ultima Homes, Inc. (In re Vaughn Co.)*, 498 B.R. 297, 304-05 (Bankr. D. N.M. 2013). The *Vaughn Co.* court engaged in an extensive analysis of the policy behind statutes of limitation like 26 U.S.C. § 6502, such as the protection of sovereign immunity. The court concluded that, since those policy purposes are not present when a trustee invokes § 544(b), the trustee should not have the benefit of the longer statute of limitations. While a thoughtful analysis, this Court does not agree that policy arguments should limit the scope of § 544(b). The plain language of § 544(b) refers to the trustee having the power to avoid transfers that are voidable under "applicable law." 11 U.S.C. § 544(b)(1) There is no indication that this phrase is limited to state law. In fact, the Supreme Court has held that this same phrase used in another statute of the Bankruptcy Code is not limited to state law. *See Patterson v. Shumate*, 504 U.S. 753, 758 (1992). Nor is there any prohibition against the IRS serving as the "creditor holding an unsecured claim" in § 544(b). 11 U.S.C. § 544(b)(1); *see also In re Kaiser*, 525 B.R. at 714 (rejecting *Vaughn Co.* court's analysis). Accordingly, this Court adopts the majority position that a trustee may invoke the ten-year statute of limitations applicable to the IRS.

The Defendant does not directly address the Trustee's "super creditor" standing via the IRS. Instead, she argues that the creditor in whose shoes the Trustee is really attempting to stand

10

is the Debtor's ex-wife. Since his ex-wife knew all about the Debtor's finances, the Defendant asserts there is no basis for tolling the state statute of limitation. However, the Trustee is free to select whichever actual creditor she wants to serve as her triggering creditor. If one is legally barred but another is not, she may select the one that does not suffer from a restriction. *See U.S. Bank N.A. v. Verizon Commc'n Inc*., 479 B.R. 405, 412 (N.D. Tex. 2012) (noting that if one creditor would be barred by an estoppel from bringing an avoidance action, the trustee may still proceed under § 544(b) if there are other creditors not barred by estoppel).

### B. Actual Fraudulent Intent

As stated above, the Defendant does not deny that the Money Transfers occurred or that the funds transferred were Debtor's property, thus establishing the first element of an actual fraudulent intent claim. To prevail on her claim, the Trustee must also establish that the Debtor made the Money Transfers with actual intent to hinder, delay, or defraud a creditor. Because a defendant will rarely admit to this intent directly, a plaintiff may prove the requisite intent through circumstantial evidence. To do so, CUFTA lists the following "badges of fraud" to guide a court's analysis in determining the intent of a transferor:

(a) The transfer or obligation was to an insider;

(b) The debtor retained possession or control of the property transferred after the transfer;

(c) The transfer or obligation was disclosed or concealed;

(d) Before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit;

(e) The transfer was of substantially all the debtor's assets;

(f) The debtor absconded;

(g) The debtor removed or concealed assets;

(h) The value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred;

(i) The debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred;

(j) The transfer occurred shortly before or shortly after a substantial debt was incurred; and

(k) The debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor.

Colo. Rev. Stat. § 38-8-105(2). "When one or more of these badges are present fraudulent intent can be inferred." *Taylor v. Rupp (In re Taylor)*, 133 F.3d 1336, 1339 (10th Cir. 1998) (discussing claims under Utah's version of UFTA and § 548(a)(1)). "Not all badges of fraud must be present before a Court may infer fraudulent intent; nor need they be given equal weight." *Los Alamos Nat'l Bank v. Wreyford (In re Wreyford),* 505 B.R. 47, 59 (Bankr. D. N.M. 2014) (applying badges of fraud to § 727 discharge action). Moreover, "[t]ransfers to family members are subjected to particularly close scrutiny. The relationship of the parties in conjunction with other circumstances often provides compelling evidence of fraud." *Zubrod v. Kelsey (In re Kelsey)*, 270 B.R. 776, 782 (10th Cir. BAP 2001). The Court finds a sufficient number of the badges of fraud are present in this case.

11

### 1. Transfers to an Insider

As his wife, the Defendant is clearly an insider of the Debtor.

### 2. Transfers Concealed

In the past, Debtor has not been reluctant to admit his intent to conceal assets from creditors. He told other individuals how he carried out this plan by putting assets in his wife's name. Mr. Guyette, the Debtor's friend and former business associate, testified that Debtor told him he titled his homes in the Defendant's name to protect them from the claims of creditors, and the Debtor advised Mr. Guyette to do the same. Unfortunately for Mr. Guyette, he followed this advice and was later forced to undo the transfers when his own bankruptcy trustee filed suit. Mr. Witwer also testified that Debtor told him he put the Conifer Ridge ownership interest in the Defendant's name to protect it from claims of creditors, including his ex-wife. Debtor himself told a financial adviser about why he titled the Residence in the Defendant's name:

> The purchase was made with funds from my efforts but as loans were easy to get in 2004 and although she was not employed the home and loan was titled to her. At the time, part of the strategy was to protect a few basic assets from risk of legal action as the industry to which I belong is subject to potentially large lawsuits.

Ex. 90, at 002486. Although Debtor disavowed this intent at trial, the Court finds this contrary evidence compelling.

The Debtor has treated bank accounts in much the same manner. In both this bankruptcy case and his 1996 bankruptcy, Debtor indicated he had no bank accounts. Debtor did open a Wells Fargo checking account in his name in 2008, but that was apparently only for the purpose of writing checks to the IRS for delinquent taxes. Ex. 91. Even that account did not list his home or work address. As previously mentioned, he did not leave funds in the Wells Fargo account but transferred the funds into it only in time to clear checks he had written to the IRS. Debtor testified that he used the LLC's account to pay both his personal and business expenses.

Debtor made all of the Money Transfers either from the LLC account or by causing the entities he worked for, or owned, to make payments directly to Defendant. In this way, his creditors could not trace the funds directly to Debtor or any bank account in his name. The Court finds this to be another method in Debtor's broader scheme of concealing assets from his creditors.

### 3. Debtor Sued or Threatened With Suit

The Money Transfers spanned the years 2007-2010, during which time Debtor had been sued or threatened with suit. Since Debtor first defaulted on his maintenance obligations back in 1990, Debtor's ex-wife has been pursuing him through the court system. Exs. 79, 80, BB, CC, EE. From 2009 to 2011, securities broker customers filed nine complaints alleging combined damages of more than $3,200,000.00 against Debtor. Amd. Joint Pretrial Statement, at ¶ 23(ii), ECF No. 43. In addition, both the IRS and the State of Colorado filed numerous tax transcripts of judgment, tax liens, demands, and notices of levy against Debtor for his past due tax liability. Exs. 84A-J, 85-87, 92-105. These collections efforts began as early as 2003 and continued

through 2012.  Trial testimony indicated Debtor was well aware of the threat of lawsuits and indeed structured his finances to protect his assets from these creditors.

### 4.      Reasonably Equivalent Value

Whether the Debtor received reasonably equivalent value in exchange for the Money Transfers is a thornier issue.  This badge of fraud "requires analysis of all the facts and circumstances surrounding the transaction."  *Schempp v. Lucre Mgmt. Group, LLC*, 18 P.3d 762, 765 (Colo. App. 2001).  The phrase "reasonably equivalent" means "approximately equivalent" or "roughly equivalent."  *Weinman v. Walker (In re Adam Aircraft Indus., Inc.)*, 805 F.3d 897, 897-98 (10th Cir. 2015) (quoting *BFP v. Resolution Tr. Corp.*, 511 U.S. 531, 548 (1994)).  In this case, the Defendant argues that Debtor received reasonably equivalent value because she used the Money Transfers to pay their joint household expenses.  She has not argued that she gave any other form of consideration.

A majority of courts have held that a spouse may receive reasonably equivalent value in the form of payment of living expenses for himself and/or his family.  *E.g.*, *United States v. Goforth*, 465 F.3d 730, 736 (6th Cir. 2006) ("[T]he greater weight of authority holds . . . that a debtor does indeed receive 'reasonably equivalent value' when he/she makes payments to his/her spouse (or co-habitant) that are used for household expenses."); *Schilling v. Montalvo (In re Montalvo)*, 333 B.R. 145, 149 (Bankr. W.D. Ky. 2005) (wife's use of debtor's funds for household expenses and for family support provided consideration to debtor).  However, not all courts agree.  Some courts limit the extent to which a debtor may claim reasonably equivalent value.  *See Carneal v. Leighton*, 237 F. Supp. 2d 104, 110 (D. Me. 2002) (noting that under Maine law there is no general duty of support of wife by husband that constitutes consideration for a transfer of husband's property); *Hovis v. Ducate (In re Ducate)*, 369 B.R. 251, 265 (Bankr. D.S.C. 2007) (holding that debtor's benefit equaled only one-half of household expenses paid by the wife with debtor's funds).

This Court has been unable to locate a Colorado case addressing this issue directly.  However, even assuming that Colorado courts would adopt the majority position, the Court must still consider the extent to which the Money Transfers actually paid for living expenses.  Without any details, the Defendant testified that she routinely paid all of the household expenses.  The Trustee admitted copies of bank statements for at least two of Defendant's checking accounts, but those statements provide little detail.  The statements show money coming into and out of the accounts, but often they do not disclose the recipients of the funds.

However, in 2009, the Debtor submitted a Form 433-A Collection Information Statement for Wage Earners and Self-Employed Individuals to the IRS.  That form listed total living expenses of $3,250 per month.[3]  Ex. 82.  In 2010, he submitted another Form 433-A that listed total living expenses of $3,800 per month.  Ex. 83.  The Schedule J that Debtor filed in this case in 2013 lists household expenses (not counting business expenses) of $4,119 per month.  Ex. 78.

---

[3] Debtor testified that the housing expense of $2,950 listed on Exhibit 82 was only one-half of their housing costs, but he offered no supporting details or documentary evidence.  Moreover, the $2,950 figure appears to be the entire housing expense as it corresponds with the mortgage payment on the Residence, which is $2,466 per month, as well as the housing-related expenses he listed on Schedule J, totaling $3,079.  Ex. 2.

Given that Debtor submitted each of these forms under penalty of perjury and they reflect a consistent amount, with graduated increases over time, the Court accepts them as an accurate representation of the amount of their joint living expenses.[4]

In particular, the Court relies on the 2009 Form 433-A's figure of $3,250 per month because it is closest in time to the Money Transfers that occurred from 2007 through 2009. Annualizing this figure, their joint yearly living expenses totaled roughly $39,000. However, in 2007, the Defendant received Money Transfers of $249,300.05. Subtracting out the living expenses from this figure leaves $210,300 in 2007 for which Debtor did not receive reasonably equivalent value. In 2008, the Defendant received $67,395 in Money Transfers. Subtracting out living expenses of $39,000 leaves $28,395 transferred without receiving reasonably equivalent value in exchange. In the years 2009 and 2010, the amount of Money Transfers fell below the $39,000 annual living expense figure. The Defendant received $25,000 in 2009 and $16,000 in 2010. As a result, the Court concludes that Debtor received reasonably equivalent value for the full amount of the Money Transfers in those later years.

Thus, the Trustee has established that Debtor did not receive reasonably equivalent value for $238,695 of the Money Transfers ($210,300 in 2007 and $28,395 in 2008). Defendant even acknowledged that, in some years, Debtor paid her more than was necessary to cover household expenses. She justified the additional amounts as savings for future expenses. This was necessary, according to Defendant, because Debtor's household contributions fluctuated significantly. The Defendant may have saved some or all of the excess funds she received in these two years, but there was no evidence that she actually spent those funds on household expenses in some later year. More importantly, Colorado's fraudulent transfer statute specifically provides that "value" for a transfer does not include "an unperformed promise made . . . to furnish support to the debtor or another person." Colo. Rev. Stat. § 38-8-104(1); *see also Hasse v. Rainsdon (In re Pringle)*, 495 B.R. 447, 464 (9th Cir. BAP 2013) (holding that promise by debtor's girlfriend to care for debtor in the future was not reasonable equivalent value for transfer of residence).

### 5.      Insolvency

The final badge of fraud the Court considers is whether the Debtor was insolvent or became insolvent shortly after the Money Transfers. Colo. Rev. Stat. § 38-8-105(2). CUFTA provides that a debtor is insolvent "if the sum of the debtor's debts is greater than all of the debtor's assets at a fair valuation." Colo. Rev. Stat. § 38-8-103(1). To apply this balance-sheet test, a court must determine the fair value of the debtor's assets and the extent of his liabilities at the time of each contested transfer. *CB Richard Ellis, Inc. v. CLGP, LLC*, 251 P.3d 523, 532 (Colo. App. 2010).

The Trustee offered the following chart summarizing the Debtor's assets and liabilities at the time of each Money Transfer:

---

[4] The 2009 Form 433-A does not contain Debtor's signature, but the cover letter attached to it indicates that Debtor's agent, Omni Financial, mailed it to the IRS on his behalf. The Debtor did not object to admission of this exhibit at trial.

| Date of Check | Date Cleared | Amount | Assets | Liabilities |
|---|---|---|---|---|
| 4/13/2007 | 5/30/07 | $3,045.92 | Between $1,150,474.28 and $1,150.008.53 | No less than $1,397,239.82 |
| 4/18/2007 | 4/24/07 | $50,000 | $1,059,551.98 | No less than $1,397,239.82 |
| 5/1/2007 | 5/30/07 | $2,754.13 | Between $1,150,474.28 and $1,150.008.53 | No less than $1,753,046.82 |
| 7/16/2007 | 8/15/07 | $50,000 | $1,348,597.76 | No less than $1,753,046.82 |
| 12/28/2007 | 1/7/08 | $70,000 | $1,756,132.49 | No less than $1,926,579.44 |
| 12/31/2007 | 1/17/08 | $73,500.00 | Between $1,735,624.77 and $1,761,758.42 | No less than $1,926,579.44 |
| 1/15/2008 | 1/15/08 | $14,321.50 | Between $1,735,624.77 and $1,761,758.42 | No less than $1,926,579.44 |
| 1/17/2008 | 1/25/08 | $3,073.67 | Between $1,777,546.29 and $1,777,089.13 | No less than $1,926,579.44 |
| 10/4/2008 | 10/7/08 | $30,000 | Between $1,591.604.48 and $1,533,739.54 | No less than $2,507,346.19 |
| 12/26/2008 | 1/15/09 | $20,000 | $721,816.29 | No less than $2,507,346.19 |
| 4/27/2009 | 5/13/09 | $10,000 | $185,940.88 | At least $1,519,579.66 |
| 10/3/2009 | 10/8/09 | $5,000 | $155,978.07 | At least $1,239,811.75 |
| 11/4/2009 | 11/9/09 | $5,000 | $139,272.96 | At least $1,239,811.75 |
| 12/28/2009 | 1/6/10 | $5,000 | $115,366.50 | At least $1,239,811.75 |
| 3/11/2010 | 4/1/10 | $5,000 | $29,477.42 | At least $1,239,811.75 |
| 4/29/2010 | 5/7/10 | $6,000 | $24,084.68 | At least $1,239,811.75 |
| 7/9/2010 | 7/16/10 | $3,000 | $16,149.23 | At least $1,239,811.75 |
| 10/29/2010 | 11/24/10 | $2,000 | $2,620.94 | At least $1,239,811.75 |

The figures reflected in the liability column represent only the stipulated amount of Debtor's tax debt during the period of 2007-2010. Amd. Joint Pretrial Statement, at ¶ 23(w)-(z), ECF No. 43. At the end of 2006, Debtor's tax liability for the years 1999-2006 was no less than $1,397,239. By the end of 2007, the tax debt had increased to $1,926,579. By July 2008, Debtor owed at least $2,507,346. As of January 2009 and again in November 2010, he owed at least $1,239,811.

In her closing arguments, Defendant tried to distance herself from these stipulated facts by arguing that Debtor's late-filed tax returns show he actually owed less tax than the amount of the IRS assessments against him. The tax transcripts reflect that the IRS did in fact later abate some of the tax, penalties, and interest Debtor owed as he filed tax returns and/or paid past due taxes. For example, the IRS first assessed Debtor's tax debt for the tax year 1999 in 2005. Ex. 51. By June 2008, that debt, including penalties and interest, exceeded $15,000. In the latter half of 2008, the debt decreased due to payments and levies. In 2009, the IRS abated the tax, presumably based on the tax return Debtor belatedly filed, and reduced some of the interest and penalties. By January 1, 2009, the IRS deemed Debtor's tax debt for tax year 1999 fully paid, but this does not change the fact that, in June 2008, Debtor owed in excess of $15,000 for the 1999 tax year. Since the Debtor owed this debt in early 2008, it is appropriate to include it in the balance-sheet test for Money Transfers that occurred during that year. *See CB Richard Ellis, Inc*, 251 P.3d at 534 (emphasizing that focus of the balance-sheet test is the debtor's financial condition at the time of each transfer). The parties' stipulated facts took into account later abatements and payments. Thus, while the 2008 transfers reflect an amount owed for the 1999 tax year, subsequent years do not. The same is true for other tax years.

The figures in the asset column reflect only the amount of funds held in the LLC's bank account on the date of each Money Transfer. Since the Defendant, rather than the Debtor, held title to the homes and cars, the Trustee has included no other assets in this column. The

Defendant does not dispute these bank account balances.  She argues instead that the asset column omits a valuable asset held by the Debtor, his 14% ownership interest in Colorado Capital Holdings ("CCH").

The Debtor testified that his CCH interest was worth approximately $2 million in mid-2008.  The Debtor did not offer an appraisal or expert testimony in support of this value.  Admittedly, the law permits the owner of a business to give his lay opinion as to the business' value.  *See James River Ins. Co. v. Rapid Funding, LLC*, 658 F.3d 1207, 1216 (10th Cir. 2011).  However, the Court determines the weight and credibility of such testimony.  Based on the surrounding circumstances, the Court does not find Debtor's valuation testimony credible.

In mid-2008, the shareholders of CCH were in the process of forcing the Debtor off its board of directors.  He asked the board to buy out his membership interest.  He offered to sell it for only $450,000.  In his negotiations, he applied a formula of "six times earnings," with a corresponding value estimate of $582,000.  He further discounted his offer to $450,000 because he knew that CCH could not afford to pay him more.  Ex. 39.  This figure represents over a 75% discount from the supposed $2 million valuation.  CCH ultimately rejected Debtor's offer and refused to purchase his interest.  There is no evidence Debtor attempted to sell his interest to a third party or that there ever was a willing buyer for any amount.  Within one year, Capstone— the source of CCH's revenues—had gone out of business due to numerous judgments entered against it in various investor lawsuits.  The Court received no evidence to indicate Debtor received any value from his CCH interest following its liquidation.  Nor did the Court receive evidence as to when the investor claims accrued.

Often courts face making decisions without receiving all the facts.  That is the case here.  The Court would have liked to know more about CCH's financial condition at relevant times.  While the parties did not offer any evidence of CCH's or Capstone's net worth, the Court finds it highly speculative and frankly incredible that Debtor's interest had any significant value from 2007 to 2010 given the numerous lawsuits filed against CCH and its demise shortly thereafter.  While it is possible that Debtor's interest might have had some value in 2007, the Court is mindful of the fact that the Trustee also did not include all of his debts in the liability column.  For example, she did not list the perennial claim of Debtor's ex-wife.  At bottom, the Court finds it highly likely that Debtor was insolvent at the time of the Money Transfers.

### 6.        Finding of Fraudulent Intent

It is not necessary to find all, or even a majority, of the listed badges of fraud to make a finding of fraudulent intent.  In this case, the Court concludes that the five badges of fraud discussed are sufficient to establish the Debtor's fraudulent intent in connection with the Money Transfers.  Even if the Court were to find that Debtor was solvent during the relevant time period, it would still find sufficient evidence that the Debtor made the Money Transfers to the Defendant in order to hinder, delay, and defraud his creditors, but only to the extent those transfers exceeded the cost of their annual joint household expenses.

### C.  Constructive Fraudulent Intent

In the alternative, the Court finds that the Trustee has proven her constructive fraudulent transfer claims as to $238,695 of the Money Transfers.  The Trustee may avoid the Money Transfers under Colo. Rev. Stat. § 38-8-105(b) and Colo. Rev. Stat. § 38-8-106(1), if the Debtor received less than reasonably equivalent value in exchange for the transfers at a time when he was in the zone of insolvency.  As set forth above, the Debtor was insolvent at the time of the Money Transfers and he did not receive reasonably equivalent value for $238,695 of the Money Transfers.

## IV.  IMPLIED TRUST CLAIMS

With the remaining assets, the Trustee has, for some unknown reason, chosen not to assert fraudulent transfer claims.  If she had, she would have easily established these claims based on the same discussion in Section III above.  Perhaps the Trustee did not employ fraudulent transfer claims for the remaining assets because she did not believe that purchasing an asset in another's name was a "transfer."  However, the Bankruptcy Code defines "transfer" very broadly to include "each mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with property or an interest in property."  11 U.S.C. § 101(54)(D)(i)-(ii).  Nearly identically, CUFTA provides that a transfer includes "every mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with an asset or an interest in an asset."  Colo. Rev. Stat. § 38-8-102(13).  Applying this same definition in North Dakota's version of the Uniform Fraudulent Transfer Act, the Eighth Circuit determined that, when a debtor transferred loan proceeds to a seller to obtain a home titled in his wife's name, the transaction constituted a transfer of the debtor's property.  Consequently, the debtor's bankruptcy trustee had "the same power to reach the property as he would if the property had been placed in [the debtor's] name."  *Kaler v. Craig (In re Craig),* 144 F. 3d 587, 593 (8th Cir. 1998); *see also Atlas Corp. v. DeVilliers*, 447 F.2d 799, 806 (10th Cir. 1971) (under New Mexico law, debtor fraudulently conveyed assets to his children where debtor assigned mining leases to corporation in return for the issuance of stock to debtor's children), *Mendelsohn v. Jacobowitz (In re Jacobs),* 394 B.R. 646 (Bankr. E.D.N.Y. 2008) (where debtor obtained a loan secured by a mortgage on his property and where, at debtor's direction, the loan proceeds were disbursed directly to his wife, the transaction constituted a "transfer" of the debtor's property under both state law and the Bankruptcy Code).

As fraudulent transfer claims, the Trustee would have stepped into the shoes of the IRS and enjoyed its longer statute of limitations.  As creditor claims, they would not be subject to the *in pari delicto* defense.  Nor would there have been an issue with whether these claims were merely remedies as opposed to stand-alone claims.  In short, the Defendant would have had no viable defense against them.  For this reason, the Court wishes the Trustee had chosen the fraudulent transfer vehicle to reach the homes and cars.

Instead, the Trustee has requested the imposition of resulting trusts or constructive trusts. The law related to these claims is murky and inexact.  These two forms of implied trusts are significantly different.  Yet courts often refer to them as though they are interchangeable. Sometimes courts fail to recognize that, as equitable claims, they are subject only to equitable defenses.  Thus, rather than a statute of limitations, only a defense of laches applies.  Sometimes

courts within the same jurisdiction cannot agree on whether these "claims" are truly claims or whether they are merely remedies for some other claims.  In short, since these claims are equitable in nature, courts seem far less concerned with analyzing them carefully, element by element and defense by defense, than they are with "doing justice," making it difficult to reconcile and apply these precedents.  With this caveat, the Court will endeavor to do so.

## A.   Resulting Trust Claims

A resulting trust is an "intent-enforcing" trust in which the settlor "has expressed no intent [to form a trust] by words, but in which he has done acts other than talking or writing from which the court finds an intent that a trust arise."  *Shepler v. Whalen*, 119 P.3d 1084, 1089 (Colo. 2005) (citing George Gleason Bogert & George Taylor Bogert, *Trusts & Trustees* § 451, at 226 (2d ed. rev. 1991)).  Courts will impose a resulting trust in at least three situations:

> (1) where an express trust fails in whole or in part; (2) where an express trust is fully performed without exhausting the trust estate; [and] (3) where property is purchased and the purchase price is paid by one person and at his direction the vendor conveys the property to another person.

*Id.* (citing *Page v. Clark*, 592 P.2d 792, 797 (Colo. 1979)).

The last example is the only one to fit the present circumstances.  A court may impose a resulting trust in the last circumstance if it finds that the intent of the transferor and transferee was that the transferor would hold or retain a beneficial interest in the property.  *Id.* (citing George Gleason Bogert & George Taylor Bogert, *Trusts & Trustees* §§ 451, 475 (2d ed. rev. 1991)).  In other words, with a resulting trust, a court enforces what it believes to be the intent of the parties as to the treatment of the asset.

According to the Colorado Supreme Court, the "classic resulting trust situation" is set forth in the case of *Valley State Bank v. Dean*, 47 P.2d 924 (Colo. 1935).  *Shepler*, 119 P.3d at 1089.  In *Dean,* the husband acquired land from his brother, conveying his own land in exchange, but, because outstanding judgments entered against him, the husband took title to his brother's land in his wife's name.  The *Dean* court held that a resulting trust arises "[w]here a person purchases land with his own money or gives his own property in exchange for other land and takes a conveyance thereof in the name of another."  *Dean*, 47 P.2d at 926.  Under these circumstances, "the beneficial interest or estate follows the consideration and inures to the person from whom the consideration comes and the grantee becomes his trustee."  *Id.*  However, the court recognized an exception to this general principle.  When the husband pays the consideration but causes the conveyance to be made to his wife, "there is a presumption that he intended it as a gift or advancement . . . ." *Id.*  Nevertheless, "strong and convincing" evidence may overcome the presumption of a gift, "in which case a resulting trust arises in favor of the husband."  *Id.*

In *Dean*, the court found strong and convincing evidence negated any intent to give the property to his wife as a gift.  The husband had acquired a deed to the land in his wife's name in order to avoid his existing creditors.  He gave the unrecorded deed to a bank in exchange for a loan.  He authorized the bank to erase his wife's name and to insert its own in the event of

default.  When the husband died before paying off the loan, the wife asserted her rights in the land.  The bank countered with its own claim for an equitable lien.  The bank's ability to obtain an equitable lien depended on whether the husband had retained a beneficial interest in the land through a resulting trust.  Under these circumstances, the court found that he had.

Applying Utah law, the Tenth Circuit recognized these same presumptions in the case of *Taylor v. Rupp (In re Taylor)*, 133 F.3d 1336 (10th Cir. 1998).  In that case, the court noted that the legal owner of the property holds the property in trust for the benefit of the party who paid the purchase price, unless that person is the spouse, child, or other natural object of bounty of the person who paid the purchase price.  *Id.* at 1341 (citing Restatement (Second) of Trusts § 440).  To impose a resulting trust in a situation where the law presumes a gift, the evidence "must be strong, clear, and convincing, such as to leave no doubt of the existence of the trust."  *Id.* (citing *Chambers v. Emery*, 45 P. 192, 195 (Utah 1896)).

In *Taylor*, the husband and wife purchased a residence in both their names decades prior to the husband's bankruptcy filing.  After approximately twelve years, the husband conveyed his interest to his wife.  The couple continued living in the home, both contributed their income toward payment of the mortgage and other expenses, and at one point they took out a joint line of credit secured by the residence.  When the husband filed bankruptcy several years later, he did not list an interest in the home in his bankruptcy schedules.  Nevertheless, the bankruptcy court found that the husband had retained a half-interest in the home and imposed a resulting trust.  The bankruptcy court focused on the husband's conduct after the transfer—his living on the premises, paying bills, cosigning a letter of credit—as evidence that he did not intend to gift the entire home to his wife.

The Tenth Circuit reversed, finding that the bankruptcy court had erected a *per se* rule that "when a husband conveys to his wife his interest in the home but intends to continue to reside there and help pay real estate taxes, insurance, and other household bills that accrue, he intends to continue to hold a fifty percent beneficial interest in the property."  *Id.* at 1342.  Instead of a *per se* rule, the focus must be on the husband's intent at the time of the transfer.  Since the husband testified he had just seen his brother's widow experience difficulty selling a home that had been co-owned and that he had heart trouble and wanted to ensure that the wife would have the home if he died, the Tenth Circuit concluded the trustee had not presented clear and convincing evidence to rebut the presumption of a gift.  To hold otherwise, the court reasoned, would prohibit spouses from accomplishing legal objectives, such as estate and tax planning.

The Tenth Circuit came to the opposite conclusion in *McGavin v. Segal (In re McGavin)*, 189 F.3d 1215 (10th Cir. 1999).  In the *McGavin* case, the husband had transferred a home to his wife.  Not many facts about the transaction are provided in the opinion, other than it was similar to the transaction in the *Taylor* case.  The bankruptcy court imposed a resulting trust on the property and, on appeal, the debtor argued the *Taylor* decision should control.  The Tenth Circuit disagreed, noting that the debtor-husband's use and control of the property "went far beyond residing in the home and paying taxes, insurance, and other household bills."  *In re McGavin*, 189 F.3d at 1218.  Unlike the *Taylor* case, the Tenth Circuit noted, the debtor in *McGavin* had used the property as collateral for various loans and he used the loan proceeds to enter into personal and business transactions for his own benefit.  These additional findings, the Tenth

Circuit concluded, adequately supported the bankruptcy court's conclusion that the debtor intended to retain a beneficial interest in the house and that the transfer of the house to the wife was not a gift but an attempt to shield his assets from creditors.

This Court could conclude from these cases that it is not enough to overcome the presumption of a gift with evidence that the debtor continued to reside in the home and to pay the household expenses, but that the trustee must also show that the debtor pledged the property for a loan for his own benefit. To reduce the reasoning of these cases to this formula, however, would only erect another *per se* rule. Instead these decisions instruct the Court to consider the particular facts and circumstances in an effort to deduce the debtor's intent at the time of the conveyance and to subject that evidence to a heightened standard of proof before overcoming the presumption of a gift. Doing so in this case leaves this Court with the firm conviction that the Debtor had no intent to gift these homes and vehicles to his wife. His sole intent was to structure his assets and income in such a way that he could retain a beneficial interest but shield them from his existing and future creditors.

As noted previously, the Debtor has made many admissions that he placed title to these assets in the Defendant's name in order to shield them from his creditors. Mr. Guyette, the Debtor's friend and former business associate, testified that Debtor told him he titled his homes in the Defendant's name to protect them from the claims of creditors. Mr. Stow Witwer, counsel for the Debtor's business partner on the Conifer Ridge project recalled, "[Debtor] did not want to be a named member [of the Conifer Ridge LLC] because it would expose his interest to claims of creditors including his former wife." Tr. II, 11:16-18. In divorce court contempt proceedings, Debtor told that court he was not an owner of the project because his ex-wife held a judgment against him. "I was never an owner anyway, but I couldn't be an owner until I paid off a twenty-five thousand and some dollar judgment that [the title company] pulled up out of the County records and I certainly didn't tell them about it." Ex. EE, at 16:18-25. In his letter to Mr. Brian Ruden of Omni Financial, dated March 4, 2009, he admitted that "[a]t the time, part of the strategy was to protect a few basic assets from risk of legal action . . . ." Ex. 90, at 002486.

The Debtor felt victimized by his divorce, the IRS, and many other events in his life. His response was to protect himself by placing his assets out of the reach of his ex-wife, the IRS, and brokerage customers. There was no credible evidence that he had any intent to gift the homes and cars to his current wife as part of estate planning or otherwise. In fact, he asserted ownership of the assets by taking deductions related to them in his tax returns. Exs. 68, 69, 71, 73, 74; Tr. II, at 64:20-68:7. This evidence clearly and compelling convinces this Court that the Debtor intended to acquire and retain a beneficial interest in the homes and cars and his only purpose in allowing his wife to take sole title was to defraud his creditors.

Nor is there any real doubt that the source of funds for the purchase of these assets was the Debtor's income. Incorporating the facts set forth in section II.B, the Trustee has established that the Debtor paid the purchase price for all three vehicles titled in the Defendant's name. They acquired all three in 2007. While the Defendant testified that she paid for these cars, the Defendant's only source of funds in 2007 came from the Debtor.

Similarly, when the Defendant purchased the Residence in 2004, the only possible source for the $132,192 down payment and subsequent mortgage payments was the Debtor, regardless

of the fact that the Defendant wrote checks to pay these amounts from her personal bank account. There is, however, one complicating factor. The Defendant was the sole obligor on the mortgage loan for the balance of the home's purchase price.

A comment to § 456 of the Restatement (Second) of Trusts addresses this situation:

> Where property is sold and a part of the purchase price is paid in cash by a person other than the transferee and the balance is secured by a purchase-money mortgage on the property, the fact that the transferee executes the mortgage and incurs an obligation to the vendor for the balance of the purchase price does not of itself entitle him to a beneficial interest in the property. In such a case the inference is that the other person, who is the real purchaser, undertakes to exonerate the transferee from any liability to pay the vendor the deficiency if on foreclosure of the mortgage the property should be insufficient for the payment of the balance of the purchase price. The result is the same where property subject to a pre-existing mortgage is purchased subject to the mortgage, although the transferee assumes the mortgage debt.

> **Illustration:**

> 8. X is the owner of Blackacre. A purchases Blackacre from X for $10,000, $4000 to be paid in cash, the balance to be secured by mortgage on the land. A pays X $4000, and at A's direction X conveys Blackacre to B who gives X his note for $6000 secured by a purchase-money mortgage on Blackacre. In the absence of other evidence, B holds Blackacre upon a resulting trust for A, but cannot be compelled to convey to A until A pays off the mortgage.

Restatement (Second) of Trusts § 456 cmt. f, illus. 8.

The Court finds that there was an implied understanding between the Debtor and the Defendant that he alone would pay this mortgage. The Defendant had no source of funds, other than the Debtor, with which to make the payments on her own. Thus, her obligation on the loan does not prevent the imposition of a resulting trust. However, to the extent that there remains any balance due on the mortgage, the Trustee will take title to this home subject to the mortgage balance, which the Trustee must repay on sale of the property.

The 21st Street Property presents the same and two additional complications. At the time of its purchase, the Defendant assumed the existing mortgage and agreed to repay her future father-in-law his loan for the down payment. After the sale, the Debtor secured the down payment loan against his prior marital home and eventually repaid his father himself. In 2002, the mortgage was fully repaid. The Court found the contradictory testimony of both the Debtor and the Defendant as to the source of funds for the repayment to be wholly incredible. In the absence of any credible evidence to the contrary, the Court finds the source of funds used to retire the mortgage came from the Debtor. In fact, the Debtor stated in the letter to his financial advisor that "2002 was the first year in which I could actually say I was making a reasonable living after business expenses." Ex. 90, at 002485. Flush with cash (despite mounting divorce debt and unpaid taxes), he retired this mortgage.

An added complication arises from the fact that, when the Defendant purchased the 21st Street Property in 1989, she had modest income in the form of social security and child support. This income stopped in 1995. However, she could have contributed some or all of her income during this six-year period toward the mortgage payments. The Court received no evidence as to the source of the mortgage payments during those six years nor as to the balance of the mortgage in 2002. Again, the Restatement addresses this issue:

> Where a transfer of property is made to one person and a part of the purchase price is paid by another, and no other evidence is offered as to the intention of the person making the part payment, it is inferred that he intended to acquire a beneficial interest in the property in such proportion as the part paid by him bears to the total purchase price, and a resulting trust arises in his favor to that extent.

Restatement (Second) of Trusts § 454, cmt. b. The problem with this approach is that the Court has no way to quantify the proportional interests of the two. The Court finds it highly likely that the Debtor made all or the vast majority of the payments, which included the down payment, the monthly mortgage payments, and the payoff of the outstanding balance. Nevertheless, in an abundance of caution, the Court will impress the 21st Street Property with a resulting trust only as to one-half of its value.

There remains one further complication. While this action was pending, the Defendant claims she borrowed $110,000 from the Debtor's friend. She gave this friend a mortgage on the 21st Street Property. Tr. I, 133:15-16; Exs. 108 & 109. Unless and until this transaction is challenged and avoided, the Trustee must take title to this home subject to the balance of this new mortgage.

## B.   Constructive Trust Claims

A constructive trust claim does not depend on a finding of an intent to form a trust. It is instead an equitable "method for working out justice and preventing one party from unjustly enriching himself at the expense of the other." *Shepler v. Whalen*, 119 P.3d 1084, 1089 (Colo. 2005) (citing George Gleason Bogert & George Taylor Bogert, *Trusts & Trustees* § 451, at 226 (2d ed. rev. 1991)). Courts sometimes refer to a constructive trust as a "fraud-rectifying" trust. *Id.* Colorado courts, however, do not require a showing of actual fraud to impose a constructive trust. *Amdura Nat'l Distrib. Co. v. Amdura Corp., Inc.* (*In re Amdura Corp.*), 75 F.3d 1447, 1452 (10th Cir. 1996). Some form of wrongdoing (including but not limited to fraud), abuse of a confidential relationship, or simply unjust enrichment will suffice. *Id.; Hill v. Kinzler (In re Foster)*, 275 F.3d 924, 926-27 (10th Cir. 2001). "A constructive trust is an equitable remedy devised to prevent unjust enrichment and compel restitution of property that in equity and good conscience does not belong to the Defendant." *In re Amdura Corp.*, 75 F.3d at 1451 (citing *In re Western Urethanes, Inc.*, 61 B.R. 243, 245 (Bankr. D. Colo. 1986)). In addition to proving wrongdoing and/or unjust enrichment, some courts also discuss the need to trace the wrongfully-held property to the transferor's funds or property. *In re Foster*, 275 F.3d at 926-27; *U.S. Dept. of Energy v. Seneca Oil Co. (In re Seneca Oil Co.)*, 906 F.2d 1445, 1540 (10th Cir. 1990).

The Court will not repeat but rather incorporates here its recitation of facts from the resulting trust section above. These same facts justify the imposition of a constructive trust as

well.  The Debtor's fraudulent intent in hiding his assets from his creditors suffices to establish the element of wrongdoing.  As a result of this fraudulent scheme, the Defendant has been unjustly enriched at the expense of her husband's innocent creditors.  She did not provide any measurable consideration for her receipt of these assets.  Finally, the Trustee has adequately demonstrated the ability to trace his funds to the Residence, the vehicles, and to at least a one-half interest in the 21st Street Property.

### C.      Defenses

The Defendant has asserted three defenses against the imposition of an implied trust.  First, she contends that resulting trusts and constructive trusts are remedies rather than separate claims and, without the assertion of the underlying claims for the recovery of these assets, these remedies are not available to the Trustee.  Second, she argues that the doctrine of *in pari delicto* prevents the Court from granting these equitable remedies.  Finally, she asserts that a statute of limitation bars the Court from imposing either form of implied trust.

### 1.      Claim vs. Remedy Defense

Opinions vary considerably on whether a "claim" for an implied trust is actually a claim or whether it is merely a remedy for another substantive cause of action.  Some courts have held, without much analysis, that resulting and constructive trusts are remedial in nature and not substantive rights.  *E.g.*, *Yavuz v. 61 MM, Ltd*., 576 F.3d 1166, (10th Cir. 2009) ("A constructive trust is a remedial device used by courts to enforce substantive rights, it is not itself a substantive right.") (construing Oklahoma law); *Howell v. Phoeniz Ins. Co*., 451 Fed. App'x 891, 894 (11th Cir. Jan. 19, 2012) ("[U]nder Georgia law a constructive trust is a remedy to prevent unjust enrichment, not an independent cause of action.").  However, there are just as many decisions that treat these requests as substantive claims, also typically without much analysis of the issue. *E.g.*, *McGavin v. Segal (In re McGavin)*, 189 F.3d 1215, (10th Cir. 1999) (affirming finding of both resulting and constructive trusts without other substantive claims pled).  Some courts have concluded that a request for a resulting trust is a claim, but that a request for a constructive trust is not.  *Butler v. Wojtkun (In re Wojtkun)*, 534 B.R. 435, 449-51 (Bankr D. Mass. 2015) (finding trustee had stated plausible claim for resulting trust but dismissing constructive trust claim because it "is a remedy, not a substantive cause of action.").  The exact nature of these implied trusts and how they impact bankruptcy proceedings has long plagued legal scholars.  *See, e.g.*, Chaim Saiman, *Restitution and the Production of Legal Doctrine*, 65 Wash. & Lee L. Rev. 993 (2008); Robert J. Keach, *The Continued Unsettled State of Constructive Trusts In Bankruptcy: Of Butner, Federal Interests and the Need For Uniformity*, 103 Com. L.J. 411 (1998).

On this issue, Colorado law is less than definitive.  The Defendant relies on the case of *Bryant v. Cmty. Choice Credit Union*, 160 P.3d 266, (Colo. App. 2007), in which the Colorado Court of Appeals held that the plaintiff's claims of resulting trust and constructive trust had been correctly dismissed by the trial court because "such trusts are remedial in nature and are inappropriately pled as a separate cause of action . . . [because] they are not theories of liability." *Id.* at 276.  However, the *Bryant* court relied on the case of *Mancuso v. United Bank of Pueblo*, 818 P.2d 732 (Colo. 1991) to support its holding.  As the federal district court in Colorado pointed out, the *Mancuso* decision does not support this position.  *Brown v. Burr*, 2008 WL 4059864, at *5 n.7 (D. Colo. Aug. 28, 2008) (noting lack of authority).

In *Mancuso*, the Colorado Supreme Court determined that the trial court had incorrectly granted summary judgment against the plaintiff on her constructive trust and resulting trust claims.  The only reference to the claim/remedy distinction appeared in a separate opinion: "[a] constructive trust is generally used as a remedy to prevent unjust enrichment" and "[b]ecause the majority has treated the constructive trust issue as a legal theory rather than as a remedy, I write separately . . . ."  *Id.* at 744 (Erickson, J., concurring in part and dissenting in part).  Justice Erickson disagreed with the majority's holding that there were disputed issues of fact, but he did not analyze the claim/remedy distinction any further as it applies to constructive trusts and did not address it at all with regard to resulting trusts.  A non-majority opinion is not binding authority on state law issues, especially when it addresses a topic only in passing as this one did.  Whatever limited precedential value it has, it is clearly outweighed by the fact that the majority opinion treated the constructive trust and resulting trust requests as stand-alone claims and remanded the case to the trial court for further findings on them.  Thus, the Colorado Supreme Court has held that requests for the imposition of resulting and constructive trusts are "claims," although admittedly without a great deal of analysis.

Many equitable doctrines suffer from this same ambiguity.  They do not arise from statutory or contractual rights.  Historically, parties brought these types of "claims" before the chancellor in a court of equity.  "[B]ecause law deals with general principles and is universally applicable, it necessarily will work injustice in some individual cases."  H. Jefferson Powell, *"Cardozo's Foot": The Chancellor's Conscience and Constructive Trusts,* 56-SUM Law & Contemp. Probs. 7 (1993).  The chancellor's jurisdiction was "to see justice done in individual cases, [remedying] the imperfect fit between the rules of law and the facts of the world."  *Id.* at 7-8.  Thus, equitable claims have always been remedial in nature.  Their contours and the prerequisites for their application have been less defined than their legal counterparts.

> Presently, in American law, equity seems to mean an amalgamation of: (i) the description given to the process of crafting remedies that do something other than award monetary damages to the plaintiff as compensation for proven losses, (ii) a set of doctrines that attempts to approximate what courts of equity did in the days when the common law was organized around the jurisdiction of writs rather than theories of rights, and (iii) a formula that, when properly incanted, affords the court the flexibility to derogate from the rules of law as justice demands.

Saiman, *supra*, at 1010 (footnotes omitted).

### a.  Constructive Trust Claims

English law and American law have treated the constructive trust doctrine differently.  "In England the constructive trust is treated as a substantive principle of liability normally imposed where a fiduciary relationship exists."  Powell, *supra*, at 11 (internal citation omitted).  The courts in England focus on "the existence of a quasi-fiduciary relationship and its abuse, not on the overall equities between plaintiff and defendant."  *Id.* (footnote omitted).  In post-Civil War America, courts view a constructive trust as "purely a remedial institution, available in a variety of situations, including what we have come to think the typical case of constructive trust, namely specific restitution of a received benefit in order to prevent unjust enrichment."  *Id.* at 13 (internal citations omitted).  Thus, the existence of a fiduciary relationship is not required here.

It is possible to view a request for a constructive trust as either a stand-alone claim or as a remedy for the substantive principle of liability known as unjust enrichment. This is a distinction, however, without a difference. Under Colorado law, the elements of a claim for unjust enrichment are: "(1) the defendant received a benefit, (2) at the plaintiff's expense, (3) under circumstances that would make it unjust for the defendant to retain the benefit without compensate compensation." *Sterenbuch v. Goss,* 266 P.3d 428, 437 (Colo. App. 2011) (citing *Lewis v. Lewis,* 189 P.3d 1134, 1141 (Colo. 2008)). In order to obtain a constructive trust "remedy," the claimant must establish these exact same elements or preconditions. Thus, this is not a situation in which a party has requested a "remedy" without first satisfying the necessary elements of the underlying claim of liability.

Since the elements are the same, the only distinction is a hyper-technical pleading requirement. Rule 8(a) of the Federal Rules of Civil Procedure, made applicable to this proceeding by Fed. R. Bankr. Pro. 7008, states that a claim for relief need only provide a "short and plain statement of the claim showing that the pleader is entitled to relief" coupled with "a demand for the relief sought." Fed. R. Civ. P. 8(a)(2)-(3). In construing pleadings, Rule 8(e) mandates that a court construe them "to do justice." Fed. R. Civ. P. 8(e). Absent a binding precedent to the contrary, this Court will not dismiss a request for a constructive trust simply because plaintiff has not pled a claim for unjust enrichment with a corresponding demand for the constructive trust remedy.

### b. Resulting Trust Claims

A request for a purchase money resulting trust presents a clearer case that it is a claim and not just a remedy. This Court is hard pressed to identify what underlying claim a plaintiff could assert in order to obtain this remedy. As previously stated, a resulting trust arises in three circumstances: when an express trust fails, when the express trust fails to exhaust the trust estate, or where one person pays the purchase price but the property is conveyed to another. *Shepler v. Whalen*, 119 P.3d 1084, 1089 (Colo. 2005); Restatement (Second) of Trusts § 404. A breach of trust claim would not cover these situations. A resulting trust claim is an action to establish a trust, not to declare it in breach. Nor would it be a remedy for a claim for reformation. "Reformation . . . is appropriate only when the instrument does not represent the true agreement of the parties and the purpose of reformation is to give effect to the parties' actual intentions." *Md. Cas. Co. v. Buckeye Gas Prod. Co., Inc.,* 797 P.2d 11, 13 (Colo. 1990). With a resulting trust, the parties' true intentions were to do exactly what they did–to have property purchased by one party but held in the name of another. There was no mistake or misunderstanding. Nor is this a remedy for rescission. Rescission unwinds a transaction, as would a resulting trust, but it would unwind the purchase as well, not merely the form of title to the acquired asset. *See Rosenfield v. HSBC Bank, USA,* 681 F.3d 1172, 1183 (10th Cir. 2012) ("Rescission in its most basic form is an equitable remedy designed to return the parties to the status quo prevailing before the existence of an underlying contract"). Since the Defendant has not identified some other underlying claim and the Court cannot find one to match, this Court concludes that a resulting trust claim is its own claim and not merely a remedy.

## 2. *In Pari Delicto* Defense

In her closing briefs, Defendant argues that the doctrine of *in pari delicto* bars all of the Trustee's claims. That doctrine "is based on the principle that when a participant in illegal, fraudulent, or inequitable conduct seeks to recover from another participant in that conduct, the parties are deemed *in pari delicto*, and the law will aid neither, but rather, will leave them where it finds them." *Sender v. Porter (In re Porter McLeod, Inc.)*, 231 B.R. 786, 794 (D. Colo. 1999). In the context of claims brought by a bankruptcy trustee, the doctrine only applies when the trustee is asserting a claim of the debtor. Then he or she is subject to all of the limitations that would prevent the debtor's recovery. *Sender v. Simon*, 84 F.3d 1299, 1305 (10th Cir. 1996). However, when a trustee is asserting a creditor claim, this doctrine does not apply. *In re Porter McLeod, Inc*., 231 B.R. at 794. In this case, the Trustee's fraudulent transfer claims are clearly creditor claims, *Shepler v. Whalen*, 119 P.3d 1084, 1088 (Colo. 2005), to which this doctrine does not apply.

### a. Constructive Trust Claims

The same is true with the constructive trust claims asserted by the Trustee under § 544(a). The Trustee steps into the shoes of a hypothetical execution or lien creditor to either avoid transfers or to assert the "rights and powers" of this hypothetical creditor. 11 U.S.C. § 544(a). One of these rights and powers is to request a constructive trust. It is not a claim a debtor could assert. "Constructive trusts . . . can only be enforced in favor of creditors." *Shepler*, 119 P.3d at 1089. By its very nature, the constructive trust arises to prevent an injustice that the debtor and/or his transferee have wrought. Accordingly, the doctrine of *in pari delicto* is not applicable to constructive trust claims. *See Shepler v. Whalen*, 119 P.3d 1084, 1088-90 (Colo. 2005).

### b. Resulting Trust Claims

The resulting trust claims are more problematic. A debtor might very well assert a resulting trust claim against the transferee in order to claim his beneficial interest in the property. For example, outside of bankruptcy, if the Debtor had a falling out with the Defendant, he might sue her to reclaim his interest in the homes and cars. However, since he purchased property in his wife's name for the purpose of evading his creditors, and such conduct is fraudulent in nature, equity would leave him and his wife where it found them. Thus, if the Trustee were stepping into the shoes of the Debtor to assert this claim, then this doctrine would bar the Trustee's recovery because the Trustee would enjoy no greater rights than the Debtor.

In fact, a purchase money resulting trust will not arise *for the benefit of the purchaser* when the purchaser establishes it for an illegal purpose:

> If the payor had the title run to another for the reason that he (the payor) desired to defeat, delay, or hinder his creditors, the case will be judged in the same way as an express trust for fraudulent purposes. Thus if A conveyed to B in trust for A with the purpose of defrauding A's creditors, A cannot enforce the trust for himself ordinarily, but his creditors can attack the transfer and get the benefit of the property. . . .

> Some courts state that "no trust results" to the fraudulent payor of the
> consideration. It would seem more accurate to hold that a trust results, but that the
> beneficiary of it will not receive aid from the court in the enforcement of the trust
> because of his unconscionable conduct.  His creditors who are innocent of any
> wrongdoing should be allowed to get the benefit of his equitable interest.

23 Ronald Chester, George Gleason Bogert & George Taylor Bogert, *The Law of Trusts and Trustees* § 463 (2015); *see also* Restatement (Second) of Trusts § 444.

When a debtor purchases property in another's name to defraud his creditors, it would seem that the creditor's remedy ought to be a fraudulent conveyance claim or a constructive trust claim rather than the resulting trust vehicle.  Nevertheless, courts have imposed resulting trusts for the benefit of creditors.  For example, in *United States v. Haddock*, 144 F. Supp. 720 (E.D.N.C. 1956), under similar facts, the court held:

> The creditor's right is an equitable one, and the money so invested is regarded as
> a personal fund fraudulently withdrawn from the husband's creditors. [C]ourts of
> equity . . . have not hesitated to lay down broad and comprehensive principles of
> remedial justice, and to apply these principles in favor of innocent parties
> suffering from the fraud of others. These principles, though firm and inflexible,
> are yet so plastic that they can be applied to every case of fraud as it occurs,
> however new it may be in its circumstances. The leading principle of this
> remedial justice is by way of equitable construction to convert the fraudulent
> holder of property into a trustee, and to preserve the property itself as a fund for
> the purpose of recompense.

*Id.* at 725 (internal quotations and citations omitted).

Colorado courts have not hesitated to do the same.  In *Valley State Bank v. Dean*, 47 P.2d 924 (Colo. 1935) discussed above, the Colorado Supreme Court held the creditor was able to reach the debtor's beneficial interest.  It declared that when the debtor purchased the property in his wife's name, a resulting trust arose in his favor.  "The property was subject to levy and sale under execution against him.  And that would be so even if, in taking title in his wife's name, [the debtor] were attempting to hinder and defeat his creditors, in which event he himself could not enforce the trust."  *Id.* at 927 (internal citation omitted).  The court then allowed his creditor to acquire an equitable lien against his beneficial interest.

In analyzing this issue, the *Dean* court relied on another Colorado Supreme Court case, *Herrick v. Woodrow-Shindler Co.*, 226 P. 137 (Colo. 1924).  In *Herrick,* the debtor paid the full consideration to purchase land in the name of his brother.  The brother later sued to have himself declared the true owner of the property.  The debtor's judgment creditor and his bankruptcy trustee defended and asked the court to allow them to reach the debtor's beneficial interest.  In imposing a resulting trust, the court explained why a creditor might pursue this remedy as opposed to a fraudulent conveyance theory:

> This is not an action to set aside a conveyance on the ground of fraud.  The object
> of these defenses . . . is to subject this property to the payment of the debt of the

real owner.  The action proceeds upon the theory that the conveyance to [the brother] is legal as a conveyance of a naked legal title, but there was a resulting trust in the property in favor of [the debtor].  Had the action been to set aside the conveyance, it might be that it would be necessary to allege and prove insolvency of the equitable owner at the time the legal title was taken in the name of another; but the object here, as stated, is to subject the property of the equitable owner to a judgment against him, and it is not necessary to allege or prove his insolvency at the time of the conveyance.

*Id.* at  370.

In *Shepler v. Whalen*, 119 P.3d 1084 (Colo. 2005), the Colorado Supreme Court engaged in a lengthy analysis of the differences between resulting trusts and constructive trusts.  It clearly stated that the remedy for a fraudulent conveyance should be a constructive trust rather than a resulting trust.  "In short, resulting trusts arise from bona fide transactions, while constructive trusts are imposed in cases of fraudulent transfers."  *Id.* 119 P.3d at 1089.  This language read in isolation would indicate that a resulting trust claim is not available to creditors and, therefore, it is a debtor's claim that would be subject to the *in pari delicto* defense.

The facts and overall analysis in *Shepler* contradict such interpretation.  In *Shepler,* the fraudulent transfer was the debtor's transfer of his funds to pay off his wife's mortgage on a home that had always been titled in her name.  The court did not state whether she had owned the home before the marriage and purchased it with her own financing, but for some reason, the court specifically found that the debtor had *not* acquired a beneficial interest in the home when his wife acquired it.  The question presented was whether the debtor's later repayment of the mortgage caused him to acquire a beneficial interest through a resulting trust.  The court held it did not and the transfer of his funds would have to be set aside through fraudulent transfer and constructive trust theories.  However, the court specifically acknowledged and recognized the "classic resulting trust situation" in *Dean,* in which the court imposed a resulting, not a constructive, trust because at the time of the asset's acquisition the debtor had paid the consideration to purchase it.

Thus, a resulting trust claim may be a claim of either a debtor or a creditor.  When a trustee brings the claim on behalf of creditors, as the Trustee has done here, it is most assuredly a creditor claim.  Under such circumstances, the *in pari delicto* defense is not applicable.

### 3.        Statute of Limitations Defense

If the Trustee had pursued recovery of the houses and cars under fraudulent transfer theories, the applicable statute of limitations would be clear.  As explained earlier, the Trustee would have the benefit of the IRS' ten-year statute of limitation that begins to run from the date of each tax assessment.  The statute of limitations applicable to implied trust claims is far less clear.  Technically, as equitable claims, they are not subject to a legal statute of limitations defense.  An equitable defense of laches applies. *First Nat'l Bank of Denver v. Harry W. Rabb Foundation*, 479 P.2d 986, 989-990 (Colo. App. 1970) (citing 5 A. Scott, *The Law of Trusts*, § 409 (3d ed.)) (resulting trust claim); *Interbank Inv., LLC v. Vail Valley Consol. Water Dist.*, 12 P.3d 1224, 1229-30 (Colo. App. 2000) (unjust enrichment claim); *Sterenbuch v. Goss*, 266 P.3d

28

428, 436 (Colo. App. 2011) (constructive trust/unjust enrichment claim); Restatement (Second) of Trusts § 409.  However, absent extraordinary circumstances, courts will analyze a laches defense by analogy to the statute of limitations applicable to an action at law of like character. *Brooks v. Bank of Boulder*, 911 F. Supp. 470, 477 (D.Colo.1996) (quoting *Shell v. Strong*, 151 F.2d 909, 911 (10th Cir.1945)).

### a.  Constructive Trust Claims

The most analogous claim to a constructive trust claim is unjust enrichment.  *See Lawry v. Palm*, 192 P.3d 550, 562 (Colo. App. 2008) ("A constructive trust is a flexible equitable remedy that may be imposed to prevent unjust enrichment").  Because an unjust enrichment claim is a form of relief in quasi-contract or contract implied in law, courts typically apply the three-year statute of limitations applicable to contract actions.  *Sterenbuch*, 266 P.3d at 437; *Oaster v. Robertson*, 173 F. Supp.3d 1150, 1174 (D. Colo. 2016); *see also Melat, Pressman & Higbie, L.L.P. v. Hannon Law Firm, L.L.C.*, 287 P.3d 842, 849 (Colo. 2012) (applying three-year period to analogous quantum meruit claim).

When does the three-year period begin?  It accrues when the claimant "is aware, or reasonably should be aware, of facts which would make a reasonable person suspicious of the wrongdoing asserted as the basis of the trust."  *Lucas v. Abbott*, 601 P.2d 1376, 1379 (Colo. 1979); Chester & Bogert, *supra*, § 953 ("The Statute of Limitations [for constructive trust] will begin to run against the cause of action from the date of the wrong, if it is known or should have been known by the injured party.").  A similar rule applies to accrual of a claim for unjust enrichment, which accrues "when a person discovers, or through the exercise of reasonable diligence should discover, that all elements of the claim are present."  *Sterenbuch*, 266 P.3d at 437.

In the case of a bankruptcy trustee, however, the three-year period only begins with the filing of the petition.  Since a constructive trust claim is a creditor claim, the Trustee's ability to bring this claim is through § 544 and, specifically, § 544(a).  Section 544(b) only applies to trustee actions to "avoid any transfer of an interest of the debtor in property or any obligation incurred by the debtor."  11 U.S.C. § 544(b).  It does not contain the same language that appears in § 544(a), which also allows a trustee to exercise "the rights and powers" of a creditor.  11 U.S.C. § 544(a).  While a fraudulent transfer claim involves the avoidance of a transfer or obligation, a constructive trust claim does not.  As a result, when a trustee brings a constructive trust claim, he or she is acting under § 544(a).

Section 544(a) allows a trustee to assert the rights and powers of a hypothetical execution or judgment lien creditor.  A hypothetical lien creditor asserting a constructive trust claim would be subject to the three-year statute of limitations.  However, the hypothetical lien creditor's rights are determined as of the petition date, "without regard to any knowledge of the trustee or of any creditor."  11 U.S.C. § 544(a).  Since accrual of a constructive trust claim depends on the claimant's knowledge of certain facts and the Trustee, as a § 544(a) hypothetical creditor, lacks any such knowledge, there can be no accrual prior to the petition date.  Thus, even if one of Debtor's actual creditors, such as this ex-wife, had knowledge of his decades-long scheme to hide assets, that knowledge would not cause the Trustee's constructive trust claim to accrue prior

to the bankruptcy filing. Accordingly, the Court finds that the Trustee's constructive trust claims are timely.

### b. Resulting Trust Claims

Once again, courts look to a like counterpart at law for an equitable claim in order to analogize a laches defense to a statute of limitations. Unfortunately, there is no like counterpart at law for a resulting trust claim. In this absence, one treatise suggests:

> It appears that the limitation period for these causes of action arising after July 1, 1987, is three years. The [Colorado] revised statutes establish a three-year limitation period for causes of action for fraud, and for breach of trust or breach of fiduciary duty. . . . [I]t is possible to seek the imposition of a . . . resulting trust . . . without alleging fraud or breach of fiduciary duty, and a claim for breach of trust may only be brought once a trust has been determined. Thus, it is possible that causes of action for imposition of a . . . resulting trust . . . will be governed by the two-year residual statute of limitation.

10 Deanna Lee Westfall & Britney Beall-Eder, *Colo. Practice, Creditors' Remedies-Debtor's Relief* § 8.4. In this case, the Defendant has asserted it is the four-year period applicable to fraudulent transfer claims.

Regardless of whether it is a two-year, three-year, or four-year period, the more significant question is when this period begins to run. On this question, courts agree but only in part. They agree that the claim accrues once there has been a "repudiation" of the trust. They agree that repudiation occurs "by word or action, show[ing] an intention to abandon, renounce, or refuse to perform under, the trust." *First Nat'l Bank of Denver v. Harry W. Rabb Foundation*, 479 P.2d 986, 989 (Colo. App. 1970). What they do not seem to agree on is *whose repudiation* triggers the claim.

Without analysis, the Tenth Circuit, applying Utah law, indicated that repudiation would require an action or statement *by the transferor* that the property in question was not subject to a trust for his benefit. Thus, in the context of a bankruptcy case, the court indicated repudiation typically occurs when a debtor files schedules claiming to have no interest in the property at issue. *McGavin v. Segal (In re McGavin)*, 189 F.3d 1215, 1220 (10th Cir. 1999); *Taylor v. Rupp (In re Taylor)*, 133 F.3d 1336, 1340 (10th Cir. 1998). In this case, the Debtor's schedules did not list an interest in the 21st Street Property, the Residence, or the vehicles.

However, as to the IRS, the Debtor had already disclaimed any interest in the homes and cars much earlier than this bankruptcy filing. The Debtor's representative, Mr. Brian Ruden of Omni Financial, transmitted to the IRS the Debtor's IRS Form 433-A on March 4, 2009. Ex. 82. In this form, the Debtor declared he owned no real estate or vehicles. This raises the question of whether repudiation first occurred in 2009. To answer this question, we must remember the source of the Trustee's ability to assert this claim. When a trustee asserts a resulting trust claim *as a creditor claim*, he does so under § 544(a). Under this statute, the trustee steps into the shoes of the hypothetical execution or lien creditor, who is not burdened by the knowledge of any actual creditor, such as the IRS.

Moreover, the great weight of authority indicates that it is *the trustee's* repudiation of a resulting trust that triggers the claim:

> In the case of a resulting trust . . . the beneficiary is not barred from enforcing the trust merely by lapse of time.  He is barred only *if the trustee* repudiates the trust to his knowledge and thereafter he takes no proceedings against the trustee for so long a time that it is inequitable to permit him to enforce the trust.

*First Nat'l Bank of Denver v. Harry W. Rabb Foundation*, 479 P.2d at 989 (citing 5 A. Scott, The Law of Trusts, s 409 (3d ed.) (emphasis added); *see also* Restatement (Second) of Trusts § 409. "Under a resulting trust theory, the statute of limitations only begins to run from the date of a repudiation *by the resulting trustee* or from the time a contrary intent is brought to the attention of the beneficiaries."  *Imperato v. McMinn,* 406 F.3d 987, 990 (8th Cir. 2005) (emphasis added). "Some act of denial of the trust or assertion of a hostile interest *by the resulting trustee* should be necessary to give the resulting beneficiary a cause of action and so to start the relevant Statute of Limitations running."  Chester & Bogert, *supra*, § 952 (emphasis added).  In this case, the Court received no evidence that, prior to this action, the Defendant, as the putative trustee, had ever indicated that the Debtor had no beneficial interest in these assets.

It is possible to reconcile these two divergent views on the source of repudiation.  As discussed in part IV.C.2(b), either a debtor or his creditors can request a resulting trust.  If the trustee is stepping into the shoes of the debtor and bringing the claim under § 541, then his claim would accrue when the putative trustee of his trust repudiated the existence of the trust.  If the trustee is stepping into the shoes of creditors under § 544(a), then the accrual date should be based on either the debtor's or the putative trustee's repudiation.  Once again, however, the bankruptcy trustee would not be burdened with the knowledge of an actual creditor.

Finally, one commentator has suggested that, even if a beneficiary is "barred by laches from holding the trustee liable for breach of trust, he does not lose his interest in the trust property merely because of a lapse of time."  Restatement (Second) of Trusts, § 409, cmt. a. Thus, there are at least three bases for establishing these claims are timely.  First, the accrual is based on the Debtor's repudiation but, because the Trustee brought her claim as a creditor claim under § 544(a), the law does not impute the IRS' knowledge to her and, therefore, her claim accrued when the Debtor filed his schedules.  Second, accrual occurs with the Defendant's repudiation, which has not yet occurred.  Third, there is no time limitation on the Trustee's ability to recover the assets, only to assert a claim for a breach of trust.  Under all three theories, the Trustee's claims are timely.

## V.   CONCLUSION

 For the foregoing reasons, the Court hereby ORDERS that:

1.  Judgment shall enter in favor of the Trustee and against Defendant Vickie L. Oletski-Behrends avoiding Money Transfers to her in the amount of $238,695 as fraudulent transfers;

2.  Judgment shall enter in favor of the Trustee and against Defendant Vickie L. Oletski-Behrends imposing a resulting trust and/or constructive trust for the benefit of the Debtor's estate on the following property (the "Assets"):

a.   a 2004 Jaguar VIN: SAJWA74C14SG24201;

b.   a 2005 Chevrolet Corvette VIN: 1G1YY34UX55121972;

c.   a 2008 Cadillac Escalade VIN: 3GYFK62808G102491;

d.   the residence located at 4635 W. 21st Circle, Greeley, Colorado, subject to the outstanding balance on any liens existing as of the date of this Order; and

e.   a fifty-percent interest in the residence located at 2010 21st Street, Greeley, Colorado, subject to the outstanding balance on any liens existing as of the date of this Order;

3.  The Trustee shall prepare appropriate documents transferring the Assets from Defendant Vickie L. Oletski-Behrends to the Trustee.  The Defendant shall execute the transfer documents within fourteen days after she receives them from the Trustee; and

4.  Judgment shall enter in favor of Defendant Vickie L. Oletski-Behrends and against the Trustee dismissing the Trustee's remaining claim to avoid Money Transfers in the amount of $119,000.22 and to the remaining fifty-percent interest in the residence located at 2010 21st Street, Greeley, Colorado.

DATED this 10th day of April, 2017.

BY THE COURT:

_Elizabeth E. Brown_

Elizabeth E. Brown, Bankruptcy Judge